# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 117

OCTOBER TERM, A.D. 2016

December 9, 2016

IN THE INTEREST OF: RAA, AMA,
and CMA, Minor Children,

RA,

Appellant
(Defendant),

v.                                                                        S-16-0109

AW,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant:*
> Deborah Ford Mincer, Attorney at Law, Cheyenne, Wyoming

*Representing Appellee:*
> Mark A. Bishop, Bishop Law Offices, Cheyenne, Wyoming

*Guardian ad Litem:*
> Carol A. Serelson, Attorney at Law, Cheyenne, Wyoming

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    RA (Father) appeals a district court decision terminating his parental rights.   He argues that the statutory requirements for termination in Wyo. Stat. Ann. § 14-2-309(a)(i) (LexisNexis 2015) were not met.   We agree with Father that communications he directed to his children were not merely incidental.   As a result, the requirement that there be no communication from the absent parent for a period of at least one year was not proven by clear and convincing evidence.   We must therefore reverse.

## ISSUE

[¶2]    While Father presents a number of issues, we find the following narrow question dispositive:   Were Father's communications to his children merely incidental so as to allow his parental rights to be terminated pursuant to § 14-2-309(a)(i)?

## FACTS

[¶3]    Father and AW (Mother) married in 1998.   They had three children together. While the family was living in Texas, Father was arrested in August of 2006 on federal charges involving white collar crimes.   Eventually he pled guilty to two counts of the indictment against him: conspiracy to commit wire fraud and aggravated identity theft, and conspiracy to commit money laundering.[1]   Father was sentenced to 120 months in prison.

[¶4]    Mother and the children visited Father in county jail at least once right after his arrest, and Mother also wrote him letters for a while.   As time went on, Mother felt it was best to protect the children by moving on and putting some distance between them and Father.   Mother became the gatekeeper of the communications between Father and the children.   She filed for divorce in Texas, and a divorce decree was entered in February of 2007.   Father did not participate in the proceedings, so the decree was entered by default. It provided in part:

> [RA] is currently incarcerated in the Hunt County Jail,
> Greenville, Texas awaiting trial on several criminal offenses
> and that his release therefrom is not imminent. It is therefore
> ordered that in the event [RA] is released from detention that

---

[1] Later on, Father tried to withdraw his plea based on a claim that he was the victim of misrepresentations by his court-appointed attorney, and that he was in fact innocent of the charges.   He pursued efforts to have his conviction set aside through various procedures in the federal courts in Texas.   Those courts found his claims to be without merit.   The court in this termination case likewise found the claims to be incredible, and the record certainly contains support for that conclusion.   However, lack of remorse has no bearing on the statutory provisions for termination of parental rights.

1

he may petition the court for access and possession with the children.

\*     \*     \*

[RA] is currently incarcerated in the Hunt County Jail, Greenville, Texas awaiting trial on several criminal offenses and that his release therefrom is not imminent. It is therefore ordered that in the event [RA] is released from detention that either of the parties may petition the court for child support and provisions for healthcare for the children.

[¶5]   Mother remarried in 2008, and she and the children moved from Texas to Wyoming with her new husband.  Mother, the children, and her new husband were able to pick up the pieces and make a new life for themselves.[2]

[¶6]   During the years he was in prison, Father sent letters and cards to the children. From 2008 until his release in 2014, he sent over forty letters and cards to his children. The substance of those communications varied from a few sentences to full-page letters to each child.  The content is about what one might expect from a person in Father's position.  He sent cards on various holidays and birthdays, reminded the children of things they had done together before he was arrested, and wrote of how he looked forward to seeing them again when he got out of prison.

[¶7]   Whether these communications reached the children was for Mother to decide. She withheld some of them because Father referred to law enforcement as the "bad police," and Mother felt such statements were inappropriate for the children to see.[3]  The children did not write back after Father was in prison – Mother testified that this was because they did not want to do so, and she did not make them.

---

[2] After Father was arrested, Mother and the children were left without a home or any funds to support themselves.  Mother was forced to file for bankruptcy, to seek public assistance in the form of food stamps and Medicaid, and to move into her parent's home with the children.  To her great credit, Mother went back to school to become a dental hygienist so that she could provide for the children.  She then met her current husband, with whom she moved to Wyoming.  By all accounts, Mother's current husband has treated the children as his own (the couple has since had children between them), and has been a good father to all.  He expressed willingness to adopt the children if Father's parental rights were terminated.

[3] In 2009, the children's paternal grandparents' petitioned a Texas court to be able to communicate with the children because Mother had cut off their access.  That court entered an order finding it in the children's best interest to have contact with the grandparents and allowing them to communicate with their grandchildren under certain conditions.

2

[¶8]   Father was granted supervised release from federal prison in November of 2014.[4] That same month, he had his attorney email Mother about visitation, which the Texas divorce decree indicated he might be granted upon release from his charges. *See supra*, ¶ 4.  Mother, acting through her attorney, would not agree to any visitation (including by phone), which prompted Father to file a petition in Laramie County (where Mother and the children now reside) to establish visitation on January 9, 2015.  In response, on January 30, 2015, Mother filed a petition to terminate Father's parental rights.[5]

[¶9]   The district court held a trial on the petition for termination, planning to proceed with a later hearing on visitation if Father's rights were not terminated.  Various witnesses testified, including Father and Mother.  A number of exhibits were also received.  The district court found that Mother had proven grounds to terminate Father's parental rights under § 14-2-309(a)(i) by clear and convincing evidence, and that it was also in the children's best interest to do so.  It determined that Father had left his children in the care of Mother without provision for support and without communication for a period of at least a year.  With regard to Father's letters and cards to his children, the district court found them to be incidental communications which did not prevent termination.[6]

[¶10]  Father timely perfected this appeal.

## STANDARD OF REVIEW

[¶11]  The issue before us presents a mixed question of law and fact.  We must first interpret the word "incidental" as set forth in Wyo. Stat. Ann. § 14-2-309(a)(i).  Statutory interpretation raises a question of law, which we review *de novo*.  *In re ARW*, 2015 WY 25, ¶ 11, 343 P.3d 407, 410 (Wyo. 2015).  We then need to decide whether the evidence was sufficient to clearly and convincingly prove grounds for termination of parental rights under the aforementioned statute.

> We apply traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. We examine the evidence in the light most favorable to the party prevailing below, assume all favorable evidence to be true, and disregard conflicting evidence presented by the unsuccessful party. Because the right to

---

[4] This is similar to parole in our state system.  Father evidently received some form of good time or other credit to shorten his ten-year sentence.

[5] In August of 2015, Father tried to see one of his children at school in Cheyenne, but that attempt was unsuccessful.

[6] In her petition, Mother also claimed that Father's parental rights should be terminated on the grounds stated in Wyo. Stat. Ann. §§ 14-2-309(a)(iii) and (a)(iv).  The district court found that neither of these grounds fit or applied to the facts before it.  Mother did not appeal that determination.

associate with one's family is fundamental, however, we strictly scrutinize petitions to terminate parental rights. As part of our strict scrutiny standard, we require that a case for termination of parental rights must be established by clear and convincing evidence. Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.

*In re HLL*, 2016 WY 43, ¶ 39, 372 P.3d 185, 193 (Wyo. 2016) (quoting *In re ARW*, ¶ 21, 343 P.3d at 413).

## DISCUSSION

[¶12] This Court is well aware that termination of parental rights is an extremely important and highly emotional issue. *In re FM*, 2007 WY 128, ¶ 27, 163 P.3d 844, 851 (Wyo. 2007). We have expressed our belief "that parents should not be given numerous chances after failing to adequately care for their children" because the "children are the victims in these situations and are being forced to suffer needlessly." *Id.* Bringing a child into this world is not simply a right, but a right with great responsibilities. *Id.*

[¶13] We have tempered that pronouncement by recognizing that "parents facing the termination of their parental rights—fundamental constitutional rights—must be afforded every procedural and substantive protection the law allows." *Id.*, ¶ 28, 163 P.3d at 851. Indeed, "[t]ermination of parental rights is the family law equivalent of the death penalty in a criminal case." *Id.*

[¶14] With this delicate and difficult balance in mind, we turn to Father's contentions. Section 14-2-309(a)(i) provides one of several statutory bases for termination of parental rights:

> (a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
>
> (i) The child has been left in the care of another person without provision for the child's support and *without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications.* For purposes of this paragraph, a court order of custody shall not preclude a finding that a child has been left in the care of another person[.]

4

Wyo. Stat. Ann. § 14-2-309(a)(i) (emphasis added). When we break this section down, we find that there are three conditions that must be satisfied by clear and convincing evidence: (1) the children have been left in the care of another; (2) without provision for support; and (3) without communication from the absent parent. *In re Termination of Parental Rights to IH*, 2001 WY 100, ¶ 19, 33 P.3d 172, 180 (Wyo. 2001). All three conditions must have occurred for a period of at least one year. *Id.*

[¶15] We need not consider whether Father left the children in the care of another when he was incarcerated, nor do we need to decide whether he failed to provide for their support.[7] The narrow issue upon which this cases hinges is whether Mother established by clear and convincing evidence that there was no communication from Father for a period of at least one year. Interwoven into this overarching question is whether Father did communicate with his children, and whether any such communications were incidental and could therefore be disregarded.

[¶16] Addressing the legal question first, our task is to determine what the word "incidental" means in the context of Wyo. Stat. Ann. § 14-2-309(a)(i). The legislature did not define this term in the statute, so we must employ our usual tools of statutory interpretation. We first look to the language used to determine how the legislature intended the statute to be applied. *In re CDR*, 2015 WY 79, ¶ 19, 351 P.3d 264, 268-69 (Wyo. 2015). If the language is sufficiently clear and unambiguous, we simply apply the statute's words according to their ordinary and obvious meaning. *Id.*

[¶17] We find the language is sufficiently clear and unambiguous and the ordinary and obvious meaning of "incidental" as used in the statute is a casual minor occurrence that is insignificant and of little consequence. *See Matter of Adoption of McMullen*, 691 P.2d 17, 20 (Kan. 1984) ("[T]the term 'incidental' as used in the statute means 'casual; of minor importance; insignificant; of little consequence.'"); *see also In re Adoption of Baby Girl P.*, 242 P.3d 1168, 1175 (Kan. 2010) (finding father's conduct more than incidental). We must make clear that "incidental" is not limited to something occurring merely by chance or without any intention. In other words, even intentional communications can be considered incidental, just as those that happen by chance can. To exclude intentional contacts from the scope of the term "incidental" would be contrary to the legislative intent of Wyo. Stat. Ann. § 14-2-309(a)(i) and our precedent. *See infra,* ¶¶ 18-20.

[¶18] When we examine the evidence presented in the light favorable to Mother, the prevailing party below, we cannot find clear and convincing evidence that Father's communications to the children were merely incidental. Father consistently tried to

---

[7] These are difficult questions. The district court held that Father had left the children in Mother's care by committing a crime which led to incarceration. This is not a basis specifically identified in the TPR statutes. It also held that Father had failed to provide support, even though the Texas divorce decree did not specify any child support obligation during incarceration. As noted, we do not address those rulings, and in refraining from doing so, we do not tacitly approve them.

communicate with his children by sending letters and cards to them during his years in prison.[8] *See supra*, ¶ 6. We have carefully reviewed these communications and are convinced that their consistency and substance are enough to take them out of the realm of the merely incidental.

[¶19] It is helpful to compare a few cases in which this Court found communication so lacking as to be incidental, and therefore to warrant termination of parental rights under § 14-2-309(a)(i). In the case of *In re SJJ*, we found the district court's conclusion that the absent parent had very limited, sporadic contact with the children for five years was supported by sufficient evidence. 2005 WY 3, ¶¶ 27-29, 104 P.3d 74, 81-82 (Wyo. 2005). During the first year the parent called the children two or three times and that during the entire five years the parent visited them only once for approximately forty-five minutes. *Id.*

[¶20] Likewise, in *In Interest of DG*, this Court again had occasion to elucidate circumstances where a parent's communications could be considered incidental. 916 P.2d 991, 996 (Wyo. 1996). We determined that DFS had demonstrated the parent had only sporadic and minimal telephone and physical contact with her children after they were taken into protective custody. *Id.* Specifically, over the course of the first year, the parent had only incidental contact with her children consisting of four telephone contacts, two letters and two short visits. *Id.* The next year, the parent participated in two visits with her children and failed to visit them on several other occasions. *Id.* And the five years after that, the parent had only five telephone conversations with her children. *Id.*; *see also Matter of SKJ*, 673 P.2d 640, 643 (Wyo. 1983) (finding parent's communications incidental).

[¶21] The record in this case demonstrates that Father made more than token efforts to maintain a relationship with his children while he was incarcerated.[9] From 2008 through 2014, he consistently sent letters and cards to his children. He did so in spite of the fact that he was sending them into a void from which no communication from the children came back. As soon as he was placed on supervised release, he attempted to initiate communication through visitation, as the Texas decree provided he could.[10] In summary, Father did just enough to avoid satisfying the statute's requirements.

---

[8] These communications are in the record, and do not require any type of credibility determination. The issue is the fact of communication proven by the letters and cards, the authenticity of which was not disputed.

[9] Confinement does not discharge a parent's obligation to continue a relationship with his or her children through such communications as are possible under the circumstances.

[10] Father also testified that he tried to telephone his children, but those calls went unanswered. The district court noted that Father did not provide any phone records of his attempts, and found Father's testimony incredible. Accordingly, viewing the evidence in a light most favorable to Mother, we do not give much weight to his alleged attempts to call his children.

[¶22] We might in a case not involving the fundamental right of familial association defer to a greater degree to the district court's findings. However, if our promise to strictly scrutinize findings in these cases means anything, it must be that we will closely examine those findings in relation to the evidence presented. When we do so, we find that the evidence falls short of meeting Mother's burden to prove grounds for termination under § 14-2-309(a)(i) by clear and convincing evidence.

[¶23] Wyoming's termination statutes were not intended as a path for a divorced parent to deprive his or her incarcerated former spouse of that fundamental right, except in those situations expressly provided for in the statutes, and those must be strictly construed. *See In re ANO*, 2006 WY 74, ¶ 23, 136 P.3d 797, 803 (Wyo. 2006). The district court's finding that termination might be in the children's best interest may very well be socially desirable, given Father's background, Mother's provision for them, and Mother's current husband's admirable qualities as a stepfather. However, courts cannot reach the question of best interest until grounds for termination are proven by clear and convincing evidence, which they were not here. *In re FM*, ¶ 22, 163 P.3d at 850.

[¶24] This is a difficult situation for all involved, and this ruling certainly does not resolve these inherent difficulties. But on the evidence before us, Father's parental rights cannot be irrevocably terminated. We recognize that Mother has valid concerns about Father exercising visitation with the children. District courts have a great deal of discretion in fashioning visitation that is in the best interest of the children. *See Arnott v. Arnott*, 2012 WY 167, ¶ 11, 293 P.3d 440, 444 (Wyo. 2012). There are ways to do so that minimize any risks, including supervised visitation, monitored telephone visitation, graduated visitation, and others. We trust the district court will choose the method of visitation which serves the children's best interests in these difficult circumstances.

[¶25] Reversed and remanded for further proceedings consistent with this opinion.